UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KATHLEEN PEZZANO
*Plaintiff*,

v.

LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY
*Defendant*.

No. 1:22-cv-02151-RMB-EAP

OPINION

**APPEARANCES**

Harry A. Cummins, Esq.
Wilkofsky, Friedman, Karel & Cummins, LLP
299 Broadway
Suite 1700
New York, NY 10007

Michael Gorokhovich, Esq.
4 Pine Court
Suite 200
Blackwood, NJ 08012

   *Attorneys for Plaintiff*

Michael Joseph Diamond, Esq.
Christopher John Sulock, Esq.
Chartwell Law
130 N. 18th St.
26th Floor
Philadelphia, PA 19103

   *Attorneys for Defendant*

**Bumb, Chief District Judge**

This matter comes before the court upon Defendant Liberty Mutual Mid-Atlantic Insurance Company's Motion for Summary Judgment (ECF No. 37) on

Plaintiff Kathleen Pezzano's claim that her excess insurance policy coverage was wrongfully denied after a portion of the living room floor in her home was discovered to have separated from a wall. Plaintiff has not opposed the instant Motion. For the reasons set forth below, Defendant's Motion will be granted.

## I. BACKGROUND[1]

### A. Procedural History

By way of Complaint filed on or about June 11, 2022 in the Superior Court of New Jersey, Law Division, Camden County, Plaintiff Kathleen Pezzano commenced suit against Defendant Liberty Mutual Mid-Atlantic Insurance Company, seeking coverage for damage sustained to her home at 7773 Grant Avenue in Pennsauken, New Jersey. (SMF ¶ 1.) On or about April 5, 2022, this matter was removed to the United States District Court for the District of New Jersey, based upon diversity jurisdiction. (SMF ¶ 2.) The Complaint contains ten paragraphs and generally alleges that Plaintiff's property sustained damage on December 19, 2021, and that Liberty Mutual breached its contract with Plaintiff when it denied coverage for the loss. (SMF ¶ 3.)

### B. Factual History

#### i. The Property

---

[1] This Court shall refer to Defendant's Statement of Material Facts as "SMF." As mentioned above, Plaintiff has not filed an opposition to the instant motion. Accordingly, the facts contained in Defendant's Statement of Material Facts are "deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a).

2

Plaintiff purchased her home approximately 23 years ago, and at all times relevant hereto, has resided there with her two children. (SMF ¶ 4.) On December 19, 2021, as Plaintiff was preparing to put up her Christmas tree, she pulled a couch away from the wall in her living room and observed a gap between the floor and the wall. (SMF ¶¶ 5-6.) Plaintiff was not aware of when the gap formed and can provide no information as to how it was formed. (SMF ¶ 7.) Plaintiff was also not aware of any other signs throughout the house that would have alerted her that the first floor of her home had suddenly dropped one to three inches. (SMF ¶ 8.)

After discovering the damage on December 19, 2021, Plaintiff called a friend over to inspect the crawl space under the house. (SMF ¶ 9.) Upon inspection, it was discovered that a beam was cracked in the crawl space. (SMF ¶ 10.) However, nothing was done at that time to shore up the cracked beam. (SMF ¶ 11.) On December 23, 2021, T&R Contracting, LLC performed shoring work on the cracked beam. (SMF ¶ 12; ECF No. 37-6 at 1.) Sometime before February 18, 2022, Plaintiff had M&J Construction come to the house to perform additional work to shore the cracked beam. (SMF ¶ 13.) Other than the work performed by T&R Contracting and M&J Construction, there have been no other repairs made to the house that are related to the cracked beam. (SMF ¶ 14.)

Plaintiff has been living in the house with her two children since she first discovered the gap in the floor, including the three-to-four-day window when Plaintiff discovered the gap but before any shoring work was completed. (SMF ¶¶ 15-17.) During depositions, Plaintiff's daughter was asked about movement of the

house and testified she never felt the floor drop, shake or move in any way, and has never heard what sounded like wood cracking or any other noise related to the house. (SMF ¶ 18.) Plaintiff's son similarly testified that he never noticed a sudden drop in one of the floors and that prior to December of 2021, had never heard any noises that sounded like wood cracking or a beam breaking, or noticed any sudden changes to the flooring. (SMF ¶ 19.)

### ii. Expert Reports

Plaintiff retained The Ramtin Group to conduct a "Forensic Structural Engineering Investigation" into the "Causes and Remedies of the Drop of First Floor." (SMF ¶ 20.) Regarding the vertical movement of the first floor in Plaintiff's home, Ramtin Saneekhatam, P.E. opined the damage to the beam was caused by wood rot and termite damage, and that deterioration of the beam happened over a period of time. (SMF ¶¶ 21-22.) However, Mr. Saneekhatam then opined "it is likely that the beam experienced a sudden vertical drop beyond the slow vertical movement that was previously happening." (SMF ¶ 23.) The Report further agreed that the shoring of the beam was the correct course of action, otherwise the house would be at "risk of collapse." (SMF ¶ 24.) Mr. Saneekhatam offered the following "Conclusion and Repair Recommendations Pertaining to Area of Drop":

> It is my professional opinion with a reasonable degree of engineering certainty that the vertical movement observed at the first floor was indeed caused by wood rot, and termite damage. It is likely that the beam supporting the dropped floor, experienced a sudden vertical drop beyond the slow vertical movement that was previously happening, as the wood rot and termite damaged continued on. The failed center beam supports floor joists placed

4

> on top of the beam, and then those joists support the center load bearing wall which in turn supports the 2nd floor framing. As to the recommended repair, we agree with the conclusions of Paul Zamrowski Associates, Inc. that "[t]he recommended method of repair is to temporarily shore/support the second floor, and then replace the first floor interior walls, subfloor, floor joists, and beams." In order to replace the beam, the subfloor and all floor joists of the 1st floor must be removed. Any interior walls bearing on those joists, including the load bearing center wall, also must be removed to free up the joists which bear on the failed beam. Prior to the removal of the load bearing center wall, but after the removal of the subfloor of the 1st floor, significant shoring on both sides of the center beam and along all exterior walls must be installed to support the 2nd floor and the exterior walls in place while the 1st floor load bearing wall and the floor joists are removed. All studs of this shoring walls must pass vertically in between the joists, in order to leave the joists free of any load and replaceable after the shoring walls are installed. Once all interior walls and subfloor are removed from the 1st floor joists to free them up, the joists must be removed, the beam replaced, and then the joists must be placed on top of the beam as originally designed, following which the subfloor can be installed, all interior walls can be reconstructed, and then all interior finishes applied. When the joists are placed on top of the new beam following the new beam installation, all new joists should be used, as the existing joists have deteriorated.

(SMF ¶ 26.)

Defendant retained Russel E. Daniels, P.E., to investigate the cause of the damage to the property and Mr. Daniels issued a report dated January 13, 2022. (SMF ¶ 27.) Mr. Daniels concluded that the damage to the property was caused by wood rot and insects. (SMF ¶ 28.)

### iii. The Policy

Liberty Mutual issued an insurance policy to Plaintiff, Policy No. H3U-231-948366-40 1 6, for the policy period of March 16, 2021 through March 16, 2022.

(SMF ¶ 29.)   Plaintiff is seeking coverage under the Policy's Collapse coverage extension.  (SMF ¶ 32.)  The following Policy provisions are relevant to the instant Motion:

> SECTION I - PERILS INSURED AGAINST
>
> COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES
>
>> We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:
>> 1. Involving collapse, other than as provided in Additional Coverage 8[;]
>> 2. Caused by:
>> * * * *
>> e. Any of the following:
>> (1) Wear and tear, marring, deterioration;
>> (2) Inherent vice, latent defect, mechanical breakdown;
>> (3) Smog, rust or other corrosion, mold, wet or dry rot;
>> (4) Smoke from agricultural smudging or industrial operations;
>> (5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.
>> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;
>> (6) Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios,

        foundations, walls, floors, roofs or ceilings;
   (7) Birds, vermin, rodents, or insects; or
   (8) Animals owned or kept by an "insured."

* * * *

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

SPECIAL PROVISION – NEW JERSEY

Item 8. Collapse is deleted and replaced by the following:
8. Collapse
 a. With respect to this Additional Coverage:
   (1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
   (2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
   (3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
   (4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
 b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:
   (1) The Perils Insured Against in Coverage C - Personal Property. These perils apply to covered buildings and personal property for loss insured by this coverage;
   (2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse;
   (3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;
   (4) Weight of contents, equipment, animals or people;

    (5) Weight of rain which collects on a roof; or
    (6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.
  c. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under b.(2) through (6) above, unless the loss is a direct result of the collapse of a building or any part of a building.
  d. This coverage does not increase the limit of liability that applies to the damaged covered property.

(SMF ¶ 30.)

Based on the conclusions of both parties' experts, is undisputed that the root cause of damage to the structural beam at the property was wood rot and termite damage. (SMF ¶ 31.)

## II. STANDARD OF REVIEW

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.

"[W]hen a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)). In the face of a properly supported motion for summary judgment, the nonmovant's burden is

8

rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.")). Failure to sustain this burden will result in entry of judgment for the moving party.

The same basic legal analysis applies when a summary judgment motion is unopposed, Anchorage Associates v. Virgin Islands Board of Tax Review, 922 F.2d 168 (3d Cir. 1990), however, the material facts put forth by the movant are deemed undisputed pursuant to L. Civ. R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

### III. ANALYSIS

"The insurer has a duty to defend the insured 'when the complaint states a claim [that constitutes] a risk.' The duty to defend is generally determined by the language of the policy. When the complaint and the policy correspond, the insurer must defend the suit." Sahli v. Woodbine Bd. of Educ., 193 N.J. 309, 322, 938 A.2d 923 (2008) (quoting Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173, 607 A.2d 1255 (1992)).  Inasmuch as there are no material facts in dispute in this motion for summary judgment, the only question before the court is whether, based on the insurance contract language, Defendant is entitled to judgment as a matter of law.

Plaintiff's Complaint alleges in pertinent part:

    5.    Heretofore and prior to March 16, 2021[,] Defendant made and issued a policy of insurance to Plaintiff[s] wherein and whereby it insured the subject premises against all risks of physical damage.

    6.    On or about December 19, 2021, the subject premises sustained a loss for which coverage is afforded under the terms and provisions of the subject insurance policy.

    7.    Thereafter, Plaintiff submitted [her] claim to the Defendant.

    8.    Defendant failed and refused, in breach of its obligations under the subject policy, to issue payment for Plaintiff's claim.

* * * *

    10.    As a result of said breach of contract, Plaintiff has sustained damages.

(Compl. ¶¶ 5-8, 10.)

Although Plaintiff's Complaint provides no indication as to which provision(s) of the policy Defendant allegedly breached, it is undisputed that she sought coverage under the Collapse coverage extension. (SMF ¶ 32.) As set forth above,

    (1)    Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
    (2)    A building or any part of a building that is in danger of falling down or caving in *is not considered to be in a state of collapse*.
    (3)    A part of a building that is standing *is not considered to be in a state of collapse* even if it has separated from another part of the building.
    (4)    A building or any part of a building that is standing *is not considered to be in a state of collapse* even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(SMF ¶ 30; ECF No. 37-12 at 33-34) (emphasis added).

In view of what clearly and unambiguously does *not* constitute a "collapse"

under the policy, Plaintiff would only be entitled to coverage for same if she could present undisputed facts to establish "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose." (ECF No. 37-12 at 34.)  Plaintiff has failed to do so.  Putting aside the absence of opposition to the instant Motion, Plaintiff's deposition testimony falls woefully short of establishing "an abrupt falling down or caving in" of the floor but instead, demonstrates a complete lack of knowledge as to when or how the floor "dropped." (SMF ¶ 8; ECF No. 37-5 at 4-5.)  Similarly, neither of Plaintiff's adult children's testimony accomplished this necessary objective.  ( SMF ¶¶ 18-19; ECF Nos. 37-8 at 3, 37-9 at 3.)

Notwithstanding Plaintiff's failure to establish a "collapse" for purposes of "Additional Coverage 8" under the policy, both experts who examined the property determined the damage to the structure of the supporting beams in the crawlspace under the floor at issue was caused over time by termites and standing water on the crawlspace foundation floor that resulted in mold and wood rot. (SMF ¶¶ 21-22, 28; ECF Nos. 37-10 at 5-7, 37-11 at 3-4.)   Plaintiff's policy specifically excludes coverage "for loss . . . [i]nvolving collapse, other than as provided in Additional Coverage 8,  [c]aused by . . . mold, wet or dry rot . . . or insects[.]"  (SMF ¶ 30; ECF No. 37-12 at 15.)  It further excludes "loss caused directly or indirectly by any of the following . . . *regardless of any other cause or event contributing concurrently or in any sequence to the loss* [:] [w]ater below the surface of the ground, including water which

11

exerts pressure on or seeps or leaks through a building, sidewalk, driveway, *foundation*, swimming pool or other structure." (ECF No. 37-12 at 16-17) (emphasis added). As such, the latter portion of Plaintiff's expert's opinion finding "*It is likely* that the beam supporting the dropped floor[ ] experienced a sudden vertical drop *beyond the slow vertical movement that was previously happening*, as the wood rot and termite damaged [sic] *continued on*[,]" is of no consequence for purposes of securing coverage under the subject policy. (ECF No. 37-10 at 7) (emphasis added).

Accordingly, Plaintiff was properly denied coverage.

### IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 37) will be granted.

An appropriate Order shall issue on this date.

Dated: __3/18/24_____        /s/   Renée Marie Bumb____
Camden, New Jersey            Renée Marie Bumb, Chief
                              United States District Judge